CERTIFIED GROCERS OF CALIFORNIA, LTD., AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22517-83.        Filed February 4, 1987.

*B. J. Seery*, for the petitioner.[1]
*Ronald M. Rosen*, for the respondent.

---

[1]Brief amicus curiae was filed by Thomas F. Wenning as attorney for the National Grocers Association.

OPINION

KÖRNER, *Judge*:[2] Respondent determined deficiencies in Federal income taxes for petitioner and certain consolidated subsidiaries for the 1979, 1980, and 1981 taxable years[3] as follows:

| Taxable year | Deficiency |
| --- | --- |
| 1979 | $2,042,782 |
| 1980 | 1,005,038 |
| 1981 | 2,825,142 |

After concessions, the issues for decision are: (1) Whether interest income earned by petitioner from its surplus cash constituted "patronage-sourced" income within the meaning of subchapter T, to any extent;[4] (2) if not, whether petitioner can offset the nonpatronage-sourced interest income with a portion of its patronage-sourced interest expense, in the computation of its income from patronage and nonpatronage sources; and (3) for the year 1980, whether petitioner is entitled to offset the income of its noncooperative subsidiaries with its claimed net operating loss on its consolidated Federal Income Tax Return.

This case was submitted for decision on fully stipulated facts pursuant to Rule 122.[5] The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

---

[2]By order of the Chief Judge, this case was reassigned to Judge Jules G. Körner III for opinion and decision.

[3]Petitioner's taxable years were fiscal years. Taxable years 1979, 1980, and 1981 ended on Sept. 1, 1979, Aug. 30, 1980, and Aug. 29, 1981, respectively.

[4]All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

The terms "patronage-sourced" and "nonpatronage-sourced" do not appear in the Code. Instead, the terms are used by practitioners and in this opinion to distinguish between income that is and income that is not derived from business done with or for patrons of the cooperative. See sec. 1388(j)(4), as added by Pub. L. 99-272, 100 Stat. 82 (1986).

[5]A hearing was held before this Court on June 24, 1985, at which the parties agreed to submit the issue of whether petitioner's interest income was patronage-sourced for our decision based on stipulated facts. They stated that their stipulation of facts would raise the additional two issues presented here for our decision based on the stipulated facts. The parties indicated at the hearing that they were in the process of gaining final approval of a settlement that they had tentatively agreed to as to other issues in the case. This case was continued for possible trial of those issues until Sept. 9, 1985. Prior thereto, respondent's counsel communicated to the Court, and confirmed on brief, that the remaining issues had been settled. Thus, no further trial was held.

Certified Grocers of California, Ltd. (hereinafter petitioner), is a California corporation organized in 1925.[6] Petitioner's principal office was located in Los Angeles, California, when it filed its petition herein.

Petitioner is a nonexempt cooperative within the meaning of section 1381(a)(2). Its patrons operate retail grocery stores and supermarkets, principally in southern California. Petitioner's function is to purchase food and related nonfood items in large volume to enable its patrons to receive the benefit of price discounts and favorable terms available to volume purchasers.[7] Petitioner warehouses the goods until it sells and delivers them to its patrons who then sell them at their retail establishments. Petitioner also manufactures bakery and dairy products that it sells to its patrons. Petitioner, as a cooperative, operates at cost and renders services to its patrons at as low a cost as possible.

Petitioner is an accrual basis taxpayer. It filed consolidated Federal income tax returns (Forms 1120) with some or all of the following subsidiaries for the taxable years at issue, in which the following amounts of taxable income were reported:

| | Taxable year | | |
| --- | --- | --- | --- |
| Entity | 1979 | 1980 | 1981 |
| Certified Grocers of California, Ltd. | $7,200 | ($172,759) | $1,467,042 |
| Grocers Equipment Co. | 159,168 | 874,393 | 133,302 |
| Grocers & Merchants Insurance Service, Inc. | 200,224 | 403,860 | 312,410 |
| Grocers Capital Co. | 66,744 | 74,931 | 189,409 |
| Spartan Grocers, Inc. | 21,762 | - - - | - - - |
| Grocers Specialty Co. | - - - | - - - | (617,999) |
| Total consolidated income reported | 455,098 | 1,180,425 | 1,484,164 |

Petitioner's reported $172,759 loss for 1980 resulted from the issuance of patronage dividends based on book income that exceeded taxable income by that amount.[8]

---

[6]Petitioner's subsidiaries are parties to this action for the years in which they joined petitioner in filing a consolidated return (see *infra*).

[7]During the years at issue less than 5 percent of petitioner's business was with nonpatrons.

[8]Petitioner's book income for its taxable year 1980 was $1,732,422. Petitioner's taxable income was lower because it did not include, inter alia, tax-exempt income, and because petitioner claimed larger deductions for tax purposes than for book purposes.

None of petitioner's subsidiaries was a cooperative within the meaning of section 1381, and none was a patron of petitioner. The income earned by the subsidiaries was not income from patronage and could not have been the basis for the issuance or the deduction of patronage dividends pursuant to sections 1382(b) and 1388, either by petitioner or by any of the subsidiaries.

Petitioner needed cash to fund its operations and finance its inventory.[9] During the years at issue, petitioner obtained cash principally from deposits required from patrons, excess patron deposits, and borrowings from banks.[10]

During the years at issue, petitioner incurred and deducted the following interest expenses:

|  | Taxable year | | |
| Interest on: | 1979 | 1980 | 1981 |
| Patron's deposits | $1,268,393 | $1,632,755 | $1,968,358 |
| Commercial borrowing | 570,293 | 1,637,946 | 3,831,247 |
| Adjustment for rounding | (3) | (1) | (1) |
| Total interest | 1,838,683 | 3,270,700 | 5,799,604 |

All of petitioner's interest expense for the years at issue was patronage-sourced, as it was directly related to its principal function as a cooperative: purchasing, warehousing, and distributing food and food-related products.

During the years at issue, petitioner occasionally had cash on hand it did not immediately need to use in its business. Petitioner used such excess cash to purchase short-term instruments such as bankers' acceptances, certificates of

---

[9]The magnitude of petitioner's need for cash is indicated by the size of its inventory at the end of each of the taxable years at issue. Petitioner's inventory was $67,261,250, $80,115,068, and $95,963,683 at the end of its taxable years 1979, 1980, and 1981, respectively. Petitioner did not bill its patrons until after it delivered goods to them, and payment was not due until 1 week after the bills were mailed.

[10]Petitioner required its patrons to deposit with it a minimum amount of cash. New members were generally required to deposit an amount equal to twice their expected weekly purchases. Every six months the required deposit was reviewed and adjusted depending upon the amount of the patron's average weekly purchases. Each year, petitioner issued a patronage dividend to its patrons consisting of 20-percent cash and the remainder in the form of qualified written notices of allocation. Petitioner treated the qualified written notices of allocation as cash contributed by the patrons toward their required deposits.

If a required deposit account contained more than the patron was required to keep on deposit, the patron had the option of either withdrawing the excess in cash, or leaving it on deposit. Petitioner paid its patrons interest on excess deposits and on required deposits that exceeded 1¼-weeks average purchases. The excess deposits provided petitioner with funds at a more favorable interest rate than available from commercial lenders and also reduced the amount petitioner needed to borrow from commercial banks.

deposit, and repurchase agreements.[11] Petitioner obtained the instruments from commercial banks that were not its patrons, and earned the following amounts of interest on the various instruments:

| | Taxable year | | |
|---|---|---|---|
| Instrument | 1979 | 1980 | 1981 |
| Bankers' acceptances | $330,410 | $69,764 | - - - |
| Certificates of deposit | 133,530 | 293,743 | - - - |
| Repurchase agreements | 292,891 | 1,057,407 | $362,528 |
| Total interest from bank instruments | 756,831 | 1,420,914 | 362,528 |

Petitioner reported the interest that it earned from its bank instruments as patronage income on its consolidated Federal Corporation income tax returns for the years at issue, with one exception. The $1,420,914 of interest from bank instruments earned during taxable year 1980 included $186,454 allocable to funds borrowed to finance construction of a mechanized warehouse for use in petitioner's food and food-related purchasing and distribution business, and temporarily reinvested until needed. In reporting its gross income from interest for 1980, petitioner reduced the amount reported by $186,454, but restored it to the full amount of $1,420,914 in computing the allowable amount of patronage dividend for which it claimed a deduction.

Although petitioner chose to use its excess cash to purchase bank instruments in an effort to manage its money efficiently, it was not required to do so in order to obtain loans from banks.

Petitioner deducted patronage dividends of $23,462,693, $29,017,057, and $27,637,752 for its taxable years 1979, 1980, and 1981, respectively, in arriving at its taxable income for those years. Respondent disallowed the portion of the deduction for patronage dividends representing petitioner's interest income from its short-term placement of excess cash with banks, as shown above, and determined deficiencies accordingly, based on his determination that petitioner had failed to establish that the interest income was patronage-sourced.

---

[11]The record does not reveal the exact terms of the instruments (e.g., just how short the "short-terms" were), nor the source of the excess cash.

## I. *The Bank Interest as Patronage Income.*

The first issue for decision is whether the interest income earned by petitioner from its purchase of short-term instruments with its cash surpluses was patronage-sourced income.[12] It is clear that interest income earned by cooperatives is, in some circumstances, patronage-sourced income. See *Cotter & Co. v. United States*, 765 F.2d 1102, 1107 (Fed. Cir. 1985); *Illinois Grain Corp. v. Commissioner*, 87 T.C. 435, 459-460 (1986). The test used by this Court to determine if income is patronage-sourced was set forth in *Illinois Grain*, where we indicated that income is patronage-sourced if it is:

so closely intertwined and inseparable from the main cooperative effort that it may be properly characterized as directly related to, and inseparable from, the cooperative's principal business activity, and thus can be found to "actually facilitate" the accomplishment of the cooperative's business purpose. * * * [87 T.C. at 459.]

We stated, conversely, that income is not patronage-sourced if it is derived from sources that:

have no integral and necessary linkage to the cooperative enterprise, so that it may fairly be said that the income from such activities does nothing more than add to the taxpayer's overall profitability. * * * [87 T.C. at 459.]

Our opinion in *Illinois Grain* indicates the analysis we apply in determining whether interest income is patronage-sourced. The petitioner in *Illinois Grain* was a cooperative that marketed its patrons' grain. It earned interest from cash that it placed temporarily in *very* short-term interest-bearing accounts (e.g., overnight, overweekend, or not-to-exceed 10-day deposits). We found that the specific nature of its business required it to have available on short notice large amounts of cash. We also found that the short-term placement of excess cash was simply prudent money management by the cooperative's managers, and we rejected the proposition that such placement constituted an "investment" of the cash as that term would generally be

---

[12]The net income of nonexempt cooperatives such as petitioner is fully taxable. The significance of whether income is patronage-sourced is that only net patronage-sourced income is eligible to be distributed to a cooperative's patrons as patronage dividends, and deducted in arriving at taxable income. Secs. 1382, 1383.

understood.[13] We instead found that the interest income was patronage-sourced as it was earned on funds that totaled no more than the cooperative needed to provide the liquidity necessary for it to operate.

As we recognized in *Illinois Grain*, our determination of whether interest income is patronage-sourced is necessarily fact-intensive. Petitioner bears the burden of establishing the facts necessary to prove that respondent's determination is incorrect. *Welch v. Helvering*, 290 U.S. 111, 115 (1933); Rule 142(a).

After carefully reviewing the entire record, we conclude that petitioner has established the facts necessary to prove that the $186,454 of interest it earned in its 1980 taxable year on its temporary investment of borrowed funds was patronage-sourced. The facts establish that $186,454 of the interest petitioner received in its 1980 taxable year was earned on the temporarily unspent portion of funds borrowed to finance construction of a mechanized warehouse for use in petitioner's food and food-related purchasing and distribution business. It is clear that the funds were needed for use in petitioner's main cooperative activity. The fact that the unspent borrowings were placed temporarily until needed in interest-bearing accounts to help offset interest expense that was accruing on the borrowings was simply prudent money management. We hold that the $186,454 of interest was so closely intertwined and inseparable from petitioner's principal business activity that it actually facilitated petitioner's business purpose and was therefore patronage-sourced income.

The story, however, does not end there. The stipulated facts further show that this $186,454 of interest was *not* reported as gross income in petitioner's 1980 return, but *was* included in the amount which petitioner paid out as a patronage dividend and for which it claimed a patronage dividend deduction for 1980. It is obvious that petitioner may not claim a patronage dividend deduction, otherwise allowable, for an item of patronage income which has not been reported as gross income in the first instance. Sec.

---

[13]Sec. 1.1382-3(c)(2), Income Tax Regs., defines nonpatronage-sourced income to include income derived from *investment* in securities.

1382(a). On this ground alone, therefore, respondent's determination as to this amount must be sustained.

The facts establish only that the remainder of the interest at issue was earned from the "short-term" (not otherwise defined) placement of funds not immediately required for use in petitioner's business. They fail to establish that the cash was so closely intertwined with and inseparable from petitioner's main cooperative effort that the interest in question is patronage-sourced.[14] Although we realize that cooperatives such as petitioner need cash to operate, the record in this case does not allow us to determine whether the funds that earned the interest income in issue were needed for use in petitioner's cooperative activity. The record does not disclose, for example, the amount of funds that earned the interest, the term for which the funds were placed, petitioner's needs for the funds, and when those needs were expected to occur.[15] Lacking such facts, we must hold that petitioner has failed to prove that respondent erred in determining that the remaining interest income was nonpatronage-sourced. Cf. *Cotter & Co. v. United States*, *supra*; *Illinois Grain Corporation v. Commissioner*, *supra*.

## II. *May Petitioner Allocate Patronage Interest Expense Against Nonpatronage Interest Income?*

Having found that a portion of the interest income in question is nonpatronage-sourced, we must next determine whether petitioner is entitled to offset such interest income with an equal amount of its interest expense which *was*

---

[14]Petitioner failed to make the extensive showing of specific foreseeable needs for cash that allowed us to determine in *Illinois Grain Corp. v. Commissioner*, 87 T.C. 435, 459-460 (1986), that the interest income at issue in that case was patronage-sourced. In *Illinois Grain*, the cooperative involved established that it needed to maintain on hand large amounts of cash because it was required, on short notice, to meet margin calls, to repay members' notes, to satisfy patrons' demands under deferred payment contracts, and to pay expenses. The cooperative's management of funds was complicated by the fact that its business was seasonal and it was difficult for it to predict when it would receive income. Its volatile need for cash led us to recognize that it had to build into its financial structure a high degree of flexibility in the form of liquidity.

[15]The record herein does not disclose the credit terms on which petitioner acquired from its suppliers the goods which it resold to its patrons. We do not know whether petitioner was required to pay for such goods C.O.D., within a week, a month, or some more generous payment period. Such facts are highly important in determining petitioner's needs for cash, and the relationship of its money-management practices to the requirements of the cooperative enterprise.

patronage-sourced, as the parties have stipulated. Petitioner argues that such an offset should be allowed and that its allowable patronage dividends should therefore not be reduced. [16] Respondent disagrees.[17]

Subchapter T prohibits the payment of patronage dividends out of nonpatronage-sourced income, in the case of a cooperative such as this petitioner. Secs. 1382(b), 1388(a). Cooperatives must therefore determine their patronage-sourced income separately from their nonpatronage-sourced income, in order to compute the allowable amount of their patronage dividends. Expenses must be assigned to the type of income to which they apply and may not be arbitrarily assigned to reduce one type of income or the other. *Farm Service Cooperative v. Commissioner*, 619 F.2d 718, 725 (8th Cir. 1980), revg. in part 70 T.C. 145 (1978). In the context of determining net income from patronage for purposes of establishing the amount available for deductible patronage dividends under sections 1382 and 1383, nonpatronage income may not be reduced by patronage expenses. *Farm Service Cooperative v. Commissioner, supra.*

Whether petitioner is entitled to offset its nonpatronage-sourced interest income with a portion of its interest expense depends upon whether all or part of its interest expense is nonpatronage-sourced. Petitioner bears the burden of proving that a portion of its interest expense is nonpatronage-sourced. *Welch v. Helvering, supra*; Rule 142(a).

The first step in determining whether an item of expense is nonpatronage-sourced is to establish how the expense arises. If the expense is incurred with respect to business done with or for patrons, it is patronage-sourced. Sec. 1388(a). The stipulated facts in this case establish that all of petitioner's interest expense was directly related to the business it does with or for its patrons: its food and

---

[16]The net effect of the offset, if allowed by this Court, would be that petitioner's allowable patronage dividends would not be reduced by respondent's determination that the interest income in question was nonpatronage-sourced. Petitioner's net patronage-sourced income would remain at its original level, as patronage-sourced income and expense would both be reduced by identical amounts. The determination would similarly result in no net nonpatronage-sourced income with respect to the interest in question, as nonpatronage-sourced interest income would be offset by patronage-sourced interest expense.

[17]The parties stipulated that such issue, although not formally raised by the pleadings, was properly before the Court, but that petitioner had the burden of proof with respect thereto. See Rule 41(b).

food-related purchasing and distribution business which constitutes its principal cooperative function.[18] We accordingly reject petitioner's argument that it is entitled to offset its nonpatronage-sourced interest income with its patronage-sourced interest expense, for the purpose of determining its net income from patronage and its allowable patronage dividend deduction. Petitioner's thesis—that the surplus funds which it used to earn interest from bank instruments could have been used to reduce its patronage-sourced debt; that the resulting interest expense would thus have been less; and that therefore petitioner should be allowed to offset its nonpatronage interest income (apparently to the point of extinction) by the interest expense which it actually incurred—is entirely speculative and unconvincing. There is nothing in this record to show to what extent, if any, petitioner could have used the excess cash which it temporarily had in its hands, from time to time, for the reduction of other indebtedness on which it was obligated, consistent with maintaining the liquidity necessary for the operation of its business. In any event, it was not done. Petitioner chose the manner in which it operated its business, and it must abide the tax results flowing from those choices. *Burnet v. Commonwealth Improvement Co.*, 287 U.S. 415 (1932). Such results cannot be changed by arguing that they would have been different if other choices had been made. See *Television Industries, Inc. v. Commissioner*, 284 F.2d 322, 324-325 (2d Cir. 1960).

### III. *The Use of Petitioner's Net Operating Loss in a Consolidated Return*

For the tax year 1980, petitioner reported a net loss of $172,759. It was stipulated that this loss resulted from the payment by petitioner of patronage dividends based upon its book income, which exceeded its reported taxable income by this amount. Since petitioner apparently treated all its income as patronage-sourced, there was no attempt to make separate computations of income or loss from patronage and nonpatronage sources.

---

[18]The terms of stipulations are generally binding on the parties. Rule 91(e). Although this Court has authority to disregard a stipulation that is clearly contrary to the facts, *Jasionowski v. Commissioner*, 66 T.C. 312, 318 (1976), the facts here do not clearly demonstrate that a portion of petitioner's interest expense was nonpatronage-sourced.

As shown in our findings of fact, petitioner filed consolidated returns in each year with certain of its subsidiaries, none of which were cooperatives. For the year 1980, this procedure resulted in a consolidated return in which petitioner's net loss, ostensibly from patronage, was combined with and offset against the net nonpatronage income of its consolidated subsidiaries. Respondent, challenging this treatment, contends that petitioner, a nonexempt cooperative, is not permitted to file a consolidated return with its noncooperative subsidiaries, at least so far as its cooperative activities are concerned. Petitioner claims it is entitled to do so, there being nothing in the Code or respondent's regulations to prevent it.[19]

So far as petitioner's right to file a consolidated return with its subsidiaries is concerned, the case is one of first impression in this Court, but we have had occasion to consider the underlying fundamental problem in a slightly different context.

Addressing first the immediate question—whether a nonexempt cooperative such as this petitioner may file a consolidated return with noncooperative members of an affiliated group, under sections 1501 through 1504—we have no difficulty in giving an affirmative answer to the general proposition. Petitioner and its subsidiaries appear to fulfill all the requirements of being includable members of an affiliated group (sec. 1504(a), (b)), entitled to file a consolidated return under section 1501 and the legislative regulations promulgated by respondent under section 1502. Indeed, respondent's regulations clearly contemplate that a cooperative may file a consolidated return: "If * * * a cooperative organization described in section 1381(a) joins in the filing of the consolidated return." (Sec. 1.1502-3(a)(3)(ii), Income Tax Regs.)

Respondent relies on two premises to reason that petitioner is ineligible to file a consolidated return. First, pointing to section 1.1381-2(a), Income Tax Regs., respondent states that exempt cooperatives (under section 521) are to be treated as section 501 exempt organizations for

---

[19]As in the case of the preceding issue, the parties stipulated to the consideration of this issue by the Court, although not formally raised in the pleadings. Rule 41(b). The parties further stipulated, however, that on this issue it was respondent who had the burden of proof.

purposes of any law that refers to tax exempt organizations. Respondent then points out that section 1504(b)(1) excludes section 501 exempt organizations from the definition of an "includible corporation" in an affiliated group entitled to file consolidated returns, except that section 501 organizations can file consolidated returns, if all other members of the group are also section 501 organizations. Sec. 1504(e).

Based on the above premises, respondent then constructs an argument based upon the following stair-step reasoning:

(a). The only important difference between an exempt cooperative and a nonexempt cooperative, such as this petitioner, is that an exempt cooperative can deduct distributions (on a patronage basis) of both patronage and nonpatronage income.

(b). Therefore, with respect to distributions of patronage income, a nonexempt cooperative functions the same as an exempt cooperative.

(c). Therefore, so far as its cooperative activity is concerned, a nonexempt cooperative should be considered as an exempt organization, and should be subject to the same limitations with respect to the filing of consolidated returns.

(d). Therefore, a nonexempt cooperative such as this petitioner should not be allowed to combine its net income/loss from patronage, even after the payment of allowable patronage dividends, with its net income/loss from nonpatronage sources, either in its own return or in the consolidated return which it files with its noncooperative subsidiaries.

(e). Therefore, petitioner, for its fiscal year 1980, should not be permitted to include the $172,759 of loss from cooperative operations in the computation of its own net income/loss, nor use it to offset the net income of its subsidiaries which was reported in its consolidated return.

We reject this line of argument out of hand. Whatever the situation may be with respect to cooperatives exempt under section 521—whether respondent may decree that such cooperatives are to be treated as exempt *under section 501*, the statute being silent, and are therefore not permitted to file consolidated returns because of the prohibitions of section 1504(b)(1), except for the narrow exception of section 1504(e) (see secs. 1.1381-2(a)(1), 1.1502-100, Income Tax Regs.)—is a matter which we may leave to another day and another case. What is clear here is that this petitioner is not an exempt organization under section 521 or any other provision of the Code, and its cooperative activities are fully taxable. Secs. 1381, 1382. Subject to the limitation next

discussed, we hold that it may file a consolidated return under section 1501 like any other qualifying corporation.

Even though a corporation may be entitled to file a consolidated return under section 1501, it is still subject to all the other relevant provisions of the Code. Sec. 1.1502-80, Income Tax Regs. In the instant case, this includes the law under subchapter T, as it has developed with respect to the tax treatment of patronage and nonpatronage income and losses.

Respondent herein now appears to concede that a cooperative may have a net operating loss, which may be carried back and forward under the provisions of section 172, that such a net operating loss can occur with respect to patronage income, and that it can be caused by the payment of patronage dividends based upon book income which exceeds taxable income from patronage. *Farm Service Cooperative v. Commissioner, supra; Associated Milk Producers, Inc. v. Commissioner,* 68 T.C. 729 (1977); see and compare Rev. Rul. 74-377, 1974-2 C.B. 274. The problem of the netting of losses still remains, and it is the same problem, whether considered in the context of the taxpayer's own return, the computation of net operating loss carryovers under section 172, or the filing of a consolidated return with noncooperative subsidiaries, as here.[20]

In *Farm Service Cooperative, supra,* the Court of Appeals held that it was improper for the taxpayer to net patronage losses against nonpatronage income through the use of carryovers under section 172. The reason was that where patronage losses result from the application of the special deductions allowed by section 1382 and section 1383, the use of such losses to offset nonpatronage income has the effect of allowing the deductions, reserved for patronage income only, to be taken against nonpatronage income in violation of subchapter T. Thus, a cooperative must compute its income and loss from patronage and nonpatronage

---

[20]We are not here concerned with the problems of netting between functions or allocation units of the cooperative. Based upon the somewhat abbreviated record before us, including the consolidated returns filed herein, it appears that petitioner had only one department or allocation unit for patronage and nonpatronage income purposes. Cf. *Farm Service Cooperative v. Commissioner,* 619 F.2d 718 (8th Cir. 1980), revg. in part 70 T.C. 145 (1978); *Ford-Iroquois FS, Inc. v. Commissioner,* 74 T.C. 1213 (1980). See further sec. 1388(j), as added by Pub. L. 99-272, 100 Stat. 82 (1986).

separately, and, at least where such computation results in a net loss on the patronage side, such loss may be carried over under the provisions of section 172 only to apply against net income from patronage in the carryover years. See *Ford-Iroquois FS, Inc. v. Commissioner*, 74 T.C. 1213 (1980).

The reasoning of *Farm Service Cooperative* is equally valid in the consolidated return situation presented here. In the computation of its own net taxable income, petitioner must segregate patronage income and expense from nonpatronage income and expense, as we have held in the preceding section of this opinion. If the former produces a net loss it may not be offset against the nonpatronage income, either in its own return (*Farm Service Cooperative, supra*), or in a consolidated return which it files with its subsidiaries. Instead, such net loss from patronage will create a special net operating loss which may be carried over to other years under section 172 for application only against net income from patronage in such years. *Farm Service Cooperative, supra; Ford-Iroquois FS, Inc. v. Commissioner, supra.*[21] The net nonpatronage income or loss of petitioner, of course, may be freely combined with the net income or loss of petitioner's noncooperative subsidiaries in a consolidated return, just as any other qualified taxpayer may do.

As the result of our holding here, as well as in the two preceding portions of this opinion, a recomputation of petitioner's income from patronage and nonpatronage sources will be necessary. If such recomputation results in petitioner having a net loss for any year from patronage sources, such net loss may not be offset against nonpatronage income, either in petitioner's own return or in its consolidated return, but is to be available only as a carryover against its net patronage income in other years,

---

[21]As the Court of Appeals intimated in *Farm Service Cooperative, supra* at 725 note 16, the same rule would not appear to apply where the facts are reversed. Thus, if a cooperative has net *income* from patronage sources, even after taking the special deductions provided by secs. 1382 and 1383, there appears to be no reason why such income may not be combined and netted with the income or loss from nonpatronage sources, for tax purposes, at least. Such net income, after all, is as fully taxable as any other net income secs. 1381, 1382(a), and the integrity of the special deductions of secs. 1382 and 1383 is not jeopardized. Respondent appears to recognize this, and has raised no issue with respect to petitioner's right to file consolidated returns with its noncooperative subsidiaries for 1979 and 1981, years in which petitioner reported net taxable income.

as permitted by section 172. *Farm Service Cooperative v. Commissioner, supra; Ford-Iroquois FS, Inc. v. Commissioner, supra; Associated Milk Producers Inc., v. Commissioner, supra.*

*Decision will be entered under Rule 155.*

Reviewed by the Court.

STERRETT, SIMPSON, CHABOT, NIMS, PARKER, WHITAKER, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, WRIGHT, PARR, WILLIAMS, and WELLS, *JJ.*, agree with this opinion.

SHIELDS and GERBER, *JJ.*, did not participate in the consideration of this case.