ILLINOIS GRAIN CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6332-84.        Filed August 18, 1986.

*Arthur E. Bryan, James L. Malone III*, and *George W. Benson*, for the petitioner.

*Janet Engel*, for the respondent.

KÖRNER, *Judge*: For the short fiscal period June 1, 1979, through February 29, 1980, respondent determined a deficiency of $1,595,926 of corporate income tax against petitioner. After concessions by both sides, the issues which we

must determine are (a) whether certain income earned by petitioner in the taxable period constituted income from patronage sources within the meaning of subchapter T,[1] and (b) if not, whether such income is subject to reduction by any offsetting expenses attributable thereto in amounts in excess of those allowed by respondent.

## FINDINGS OF FACT

Many of the facts herein were stipulated, and such stipulations are incorporated herein by this reference.

At the time of the filing of its petition herein, petitioner corporation (hereinafter petitioner or IGC) had its principal office and place of business at Bloomington, Illinois. Petitioner's tax return for the period here involved was filed on the accrual basis with the Internal Revenue Service at Kansas City, Missouri.

During its taxable year beginning June 1, 1979, and ending February 29, 1980 (FY 1980), IGC was a corporation operating on a cooperative basis within the meaning of section 1381(a)(2), as amended. Prior to IGC's FY 1980, it operated with a fiscal year ending May 31. IGC's fiscal year 1980 was a 9-month taxable year, since, effective March 1, 1980, IGC combined with FS Services, Inc. (which on that date changed its name to Growmark, Inc.) and was then included in Growmark's consolidated Federal income tax return.

During FY 1980 and all of its prior taxable years, IGC was engaged, on behalf of its member and nonmember patrons, in the purchase, distribution, and sale of grains, principally corn and soybeans, and the provision of certain ancillary services in connection therewith. With respect to its member patrons, IGC operated on the cooperative basis. With respect to its nonmember patrons, IGC operated on a noncooperative or commercial basis. During FY 1980, IGC had as member patrons approximately 187 local cooperatives located principally in Illinois and 8 regional grain cooperatives located principally in the midwest. IGC's local cooperative members were farmers' cooperative associations

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.

which stored, purchased, conditioned, and sold grains for their farmer members on a cooperative basis.

Membership in petitioner was limited to agricultural producers or associations of agricultural producers meeting the requirements and operating in accordance with the Agricultural Marketing Act of 1929 or the Capper-Volstead Act. Each member of petitioner entered into a uniform membership agreement with petitioner which provided that petitioner would, among other things: (1) Make its facilities and services available to a member company on the same equitable basis and manner as to other member companies signing similar agreements; (2) assist member companies in the selection of management personnel; and (3) furnish member companies with various advisory and consulting services. The member company, in turn, agreed that it would: (1) Operate within the provisions of the Capper-Volstead Act or the Agricultural Marketing Act of 1929; (2) use every reasonable effort to utilize the facilities and services of petitioner to the fullest possible extent; (3) offer petitioner the opportunity to purchase all of the grain marketed by the member company, except grain sold locally; and (4) comply with certain requirements pertaining to annual audits, management selection, and use of trademarks. The membership agreement did not bind the member to sell its grain to petitioner, nor did it specify the amounts or timing of grain which would be offered for sale through petitioner.

Nonmember patrons, of course, had no such membership agreement with petitioner. Sales of grain offered by nonmember patrons were commingled and handled in the same manner by petitioner as sales for member patrons, except that no patronage refund or dividend was paid to nonmember patrons with respect to their business.

As part of its total grain marketing program, petitioner performed various services for its members. These services included furnishing members advisory and consulting services, information and data, specialized and technical business analysis, market information, hedging assistance, merchandising and storage-use programs, and other assistance to help the members improve their operations. Petitioner's advisory services included reviewing members' financial

positions and providing members with a comparative analysis of all the member companies as a basis to measure their own performance. The purpose of these member service functions was to assist members in improving their operations so that petitioner would be able to purchase more grain from them, which, in turn, would enhance petitioner's market position and its ability to service members.

With respect to its nonmember patron business, petitioner retained the earnings from such business and paid income tax thereon. During FY 1980, petitioner calculated that its business with members accounted for 65.62 percent of its total grain purchases, and its business with nonmembers accounted for the remaining 34.38 percent of its grain purchases. The division between member and nonmember patronage income was determined on this basis.

In order for petitioner to maximize the return it could get for marketing its patrons' grain, it was necessary that it be organized and operated in an efficient manner and that it find markets for the grain.

The grain which petitioner marketed for its patrons was sent to market either by rail or through a river barge system operating down the Illinois and Mississippi Rivers. Some of petitioner's patrons, located principally in central and eastern Illinois, were too far from the Illinois and Mississippi Rivers to be able to deliver grain economically to petitioner's river terminals. These patrons were served by petitioner's "track and processor" merchandising operations. In its fiscal year 1979, petitioner opened a new grain terminal at Paxton, Illinois, to service these patrons. The terminal was located at the intersection of two railroads, and patrons' grain could be shipped from there by rail either to the Gulf Coast or the East Coast for export. During FY 1980, petitioner leased approximately 400 covered railroad hopper cars to provide an assured supply of railroad cars for transportation to connect the Paxton terminal with export terminals on the Gulf and East Coasts. Having control of rail equipment is an important part of merchandising grain through rail terminals.

In the 8 full fiscal years immediately preceding the short fiscal year in issue, the annual volume of petitioner's grain sales ranged from just under 160 million bushels to just

under 318 million bushels. During this period, approximately 60 percent of the grain marketed by petitioner went through the river barge system. Ever since the late 1940's, the core of petitioner's grain marketing business was its river system. The river system was keyed to utilizing the advantages of economical river transportation to provide Illinois farmers an access to world markets. In addition to the numerous country grain elevators in Illinois owned by petitioner's members, petitioner owned six subterminal elevators on the Illinois River. Two terminal elevators on the Mississippi River in St. Louis, Missouri, were owned and operated by St. Louis Grain Corp. (SLGC), an interregional grain marketing cooperative of which petitioner was the principal member patron, and an export elevator in Ama, Louisiana, was owned by Farmers Export Co. (Farmers), another interregional grain exporting cooperative in which petitioner was a member patron. Additionally, in FY 1980, petitioner was the second largest member patron of Agri-Trans Corp. (ATC), an interregional barging cooperative owned by five regional cooperatives. ATC barged grain south for its four grain member cooperatives, down the Illinois and Mississippi Rivers to New Orleans, and barged fertilizer back to the Midwest for the fifth member, a cooperative fertilizer manufacturer. ATC satisfied about 45 to 50 percent of petitioner's barging needs. For a grain company such as petitioner, with river terminals, barging is an integral part of grain merchandising. Without direct or indirect control of barges, such a grain merchandiser is at the mercy of the market. Consequently, the ability to have an assured source of supply of barges was very important for petitioner. In prior years, petitioner and its predecessors had been adversely affected by barge shortages and had taken some steps to gain control over barges. This was done by leasing barges to barge companies who were then willing to commit a greater number of barges to move petitioner's grain. To assure a source of barges to move grain from its Illinois River terminals, in 1958, petitioner entered into an arrangement with its then principal supplier of barge transportation (The Mechling Co.), a manufacturer of barges (Dravo Corp.), and an insurance company (Northwestern Mutual Life Insurance Co.), which called for the construction of four

barges by Dravo, which were financed by the insurance company as owner, leased to petitioner pursuant to a long-term bareboat charter, and subchartered to Mechling, which then used those barges and others to move petitioner's grain. Petitioner originally entered into the bareboat charter arrangement with Northwestern Mutual Life Insurance Co. because petitioner was short of capital. The arrangement permitted petitioner to acquire the barges without incurring additional long-term debt.

Prior to 1967, petitioner had shipped a substantial amount of its grain through the Great Lakes and the St. Lawrence Seaway, using a terminal which it then owned in the area of Chicago. In 1967, petitioner disposed of its Chicago terminal and thereafter concentrated its efforts on shipping grain by barge south to New Orleans. Shipments down the Illinois and Mississippi Rivers increased dramatically, so that by its 1975 fiscal year, petitioner loaded approximately 1,300 barges of grain on the Illinois River.

After disposing of its Chicago terminal, petitioner caused its four barges to be subchartered to whichever firm was then the principal supplier of barge services to petitioner. In 1973, petitioner subchartered the barges (of which three remained in operation) to Rose Barge Line. At the time, Rose was the largest hauler of petitioner's grain to the Gulf. When ATC was formed in 1974, it purchased substantially all of the assets of Rose and also succeeded to the subcharter between petitioner and Rose. The subcharter to ATC was subsequently renewed as to the barges (of which two remained in operation) and remained in effect in FY 1980.

Although petitioner could not control the specific use which ATC made of these barges under the subcharter, ATC used the subcharter barges plus its other barges to transport petitioner's grain from petitioner's river terminals to New Orleans. In FY 1980, petitioner relied on ATC to supply it with approximately half its barging needs. Petitioner regarded the barges it subchartered to Rose and later to ATC as an extension of its river system. In FY 1980, the two barges leased by petitioner to ATC comprised a small part of the ATC fleet of eight tow boats and 335 barges. In that year, ATC carried approximately 1,200 barge loads of

grain for petitioner, at a cost to petitioner in the range of $15 to $25 million. With respect to the two barges subchartered to ATC, petitioner received gross barge rentals of $13,109 in FY 1980. On its books, petitioner did not show the barge rentals as a separate item of income, but simply netted the barge rentals received against the overall transportation costs which it paid to ATC. On its FY 1980 tax return, however, petitioner reported gross income from various rents, among which was the $13,019 from barge rent.

The grain business is extremely competitive, and competition for grain in the areas in which petitioner operated was intense. Petitioner competed with grain processors in Illinois and with the major worldwide grain companies. The principal form of competition was price competition. The major companies in the world grain trade are large private grain firms such as Cargill, Inc., Continental Grain Co., Louis Dreyfus, and Bunge Corp. These are very large companies with access to worldwide capital. For example, Cargill, Inc.'s fiscal 1985 sales were $32 billion. By comparison, petitioner's annual sales in fiscal 1979 were approximately $925 million.

The grain market is also highly volatile, which is the result of many things affecting supply, demand, and price, including seasonal factors, cyclical factors, political factors, and the weather. Seasonal factors affecting the grain business are a result of the fact that grain is harvested at one time of the year and then marketed over a 12-month period. The exact marketing pattern of each year's crop is not predictable.

There is no way for a company in the grain business to insulate itself from the supply, demand, and resultant price volatility that exists in the grain business. The volatility of this business results in grain price fluctuations which have a major impact on grain companies. Grain price fluctuations can result in rapid changes in a grain company's capital requirements. A substantial increase in grain prices can result in significant cash demands upon a company, such as petitioner, as a result of such things as increases in margin requirements and inventory values. A substantial decline in grain prices would have the opposite effect; it would reduce

capital needs and provide additional funds to a company such as petitioner. To deal with the volatility that exists in the grain business, a company must build into its financial structure a high degree of flexibility in the form of liquidity in order to fund the changes in its current assets and liabilities.

During the period June 1, 1978, through February 29, 1980, petitioner's assets (current and fixed) varied at monthend from approximately $60 million to more than $100 million. The volatility in petitioner's capital needs arose principally from sharp fluctuations in its current assets (e.g., inventory, accounts receivable, margin deposits, grain sales advances, and cash and short-term instruments). For instance, petitioner's current assets went from approximately $28 million on September 30, 1978, to approximately $66 million on December 31, 1978, and back to approximately $39 million on May 31, 1979. It was essential to the conduct of petitioner's grain marketing business that petitioner have the necessary financial flexibility to be able to finance the highs which it experienced in its capital needs. There were periods of time when petitioner was short of quick cash working capital, as well as other periods in the year when petitioner had temporary surpluses in its working capital. Petitioner was undercapitalized; it lacked an adequate amount of capital to compete effectively with the large international grain companies. Undercapitalization made it potentially more difficult for petitioner to operate on a day-to-day basis.

Petitioner's long-term debt was financed with the St. Louis Bank for Cooperatives (St. Louis Bank). In its FY 1980, such long-term debt fluctuated narrowly in the range between $13.7 million and $14.9 million (using rounded figures). Aside from this long-term debt, petitioner had short-term or current liabilities, principally in the form of notes payable, sales advances, and accounts payable, which fluctuated rapidly during the course of the year, and which generated both deficits and surpluses of working capital at various times. The causes of these fluctuations were both market conditions as well as specific financing programs which petitioner used in aid of its grain-marketing efforts.

The principal causes may be identified and described as follows:

## (A) *Deferred Pricing Program*

Petitioner entered into contracts with members which allowed them to sell grain to petitioner, while at the same time allowing the members to defer the time when such grain would be priced for up to 270 days. Petitioner was able to take title to the grain, sell the grain and generate cash, while its obligation to pay for the grain was deferred. Later, when a member elected to price the grain, petitioner was required to make payment *the next day*, provided that in no event was payment due earlier than 60 days after the original transfer to petitioner.

In FY 1980, deferred pricing contracts generated temporary cash for petitioner, since many deferred pricing contracts were entered into in late summer and early fall 1979, and the member companies who entered into these contracts did not price the grain until after January 1, 1980. Although petitioner was initially reluctant to offer a deferred pricing program to its members, it did so to meet competition from other grain companies and to satisfy the demand for such arrangements from its members and from their farmer members. A deferred pricing program made it possible for petitioner to obtain grain at times its members might otherwise be reluctant to sell grain because of their evaluation of the market.

When petitioner sold grain which it had received under the deferred program, it immediately went into the futures market and bought a futures contract. Petitioner was then short in cash grain, because it had sold the grain, and it was long on the futures market. In this way, petitioner was able to hedge its position. Ordinarily, prices in the futures market are higher in March than in November. This increase reflects storage carrying charges for grain and the cost of money to hold the grain from November until March. To offset the storage carrying charge built into the cost of hedging, petitioner charged members a service charge for deferred pricing transactions. To offset the cost of money factor built into the cost of hedging, petitioner was able to use the cash generated by the transaction.

(B) *Hedging Activities*

It was the policy of petitioner to sell grain on a hedged basis as much as was practical. Hedging is an integral and necessary part of the business of any grain marketing company. Petitioner entered into contracts to purchase grain and contracts to deliver grain and then hedged the open cash-grain commitments in the futures market to minimize its vulnerability to losses from price fluctuations. For hedging purposes, petitioner used the services of Illinois Cooperative Futures Co. (ICFC), cooperative headquartered in Chicago, which executed futures contracts on the Chicago Board of Trade for its members. ICFC's membership included 104 regional and local cooperatives, including petitioner. It was necessary for petitioner to make an initial margin deposit on each futures contract it bought or sold when it hedged on the Chicago Board of Trade. As the market price of grain changes every day, petitioner was required either to make additional margin deposits, or margin money was returned to petitioner. Petitioner normally was long on grain and short in the futures market. When the price of grain increased, petitioner was normally required to increase its margin deposits. When the price of grain decreased, margin deposits were returned to petitioner.

In FY 1980, petitioner's hedging activities generated cash as margin money was released. This was the result of petitioner's smaller inventory and of price movements in the market. In a 10-day period during June 1979, there was a $10 million swing in amounts required to be put up by petitioner as margin for its hedging activities. Petitioner regarded the conditions leading to the reduction of its margin requirements as temporary in nature, and did not know how long they would last.

(C) *The Member Note Program*

Petitioner believed that it was in its members' best interests to use *their* temporary surplus working capital in a way which would maximize the amount that they could return to their farmer members. In addition, petitioner was concerned that member company funds were not always safe when, as was often the case, they were left in

small-town banks. In response to this situation, in the early seventies, petitioner developed a member note program. Offering the member note program to its members was one of the service programs which petitioner provided its members, similar to hedging and other service programs. It also provided petitioner with a source of short-term funds.

The member note agreements provided that petitioner would hold the members' funds for a minimum term of 15 days and a maximum of 270 days. Petitioner paid the member a fixed rate of interest which ordinarily was set at two percentage points below the prime rate of interest at the time the note was issued. A member could redeem its note upon demand for cash any time after the 15th day.

Petitioner's members increased the amount of member notes they placed with petitioner in the fall of 1979 over previous years. The same conditions that left petitioner with temporary surplus working capital during this period also left petitioner's members with temporary surplus working capital. The member company note program generated a significant amount of cash for petitioner in FY 1980, particularly during the period petitioner had temporary surplus working capital from other sources.

(D) *Inventories*

Petitioner's inventories decreased in July and August 1979. Inventories moved upward in September and October, but not in as great an amount as was expected during a normal harvest period. Inventories dropped further in November and December and then increased in January and February 1980. When inventory quantities or values decreased, funds were freed up in petitioner's business. Declines in the quantities and value of petitioner's inventory contributed to its temporary surplus working capital during the last part of FY 1980.

(E) *Earnings*

Petitioner generated small earnings during the early portion of its FY 1980. As petitioner got into the harvest period, however, it generated substantial earnings from August through December. There was a reduction in earnings in January of about $1 million as a result of the

Russian grain embargo, and a slight recovery in February. Earnings were one source for petitioner's temporary surplus working capital position during the last part of FY 1980.

---

In the management of its capital requirements, petitioner maintained banking relationships with the St. Louis Bank and also with the First National Bank of Chicago (First National Bank). In addition to its long-term debt which it had financed with the St. Louis Bank, petitioner also had a $40-million short-term line of credit from the St. Louis Bank, and a $20-million short-term line of credit with the First National Bank. The rate of interest the St. Louis Bank charged petitioner on short-term and long-term borrowing during the fall of 1979 was 10 percent. On January 1, 1980, the short-term rate moved up to 13 percent while the long-term borrowing rate stayed at 10 percent.

During FY 1980, before the end of the grain market on each day (approximately 1:15 to 1:30 p.m.), petitioner assessed its cash needs for the day. If it required additional cash, it would borrow short-term from one of the two above mentioned banks. If it made this decision before noon, it borrowed funds from the St. Louis Bank. If the need for funds arose later in the day, the funds were borrowed from the First National Bank. Since the Chicago Board of Trade required any additional required margin to be posted within 45 minutes of the closing of the market, it was necessary that petitioner have a banking relationship with a bank located in Chicago. In addition to its needs for funds to meet these requirements, petitioner also felt that it was important to its financial flexibility not to restrict itself to a banking relationship with a single bank.

As a result of all the forces described above, if petitioner found itself in a net positive cash position on a particular day, it would first pay back any short-term borrowings that it had outstanding (e.g., member notes, short-term bank loans). If no short-term borrowings were outstanding, then petitioner would use any temporary surplus working capital to purchase short-term instruments. Occasionally, by miscalculation or mistake, petitioner would use such cash to

purchase short-term instruments before all short-term borrowings were paid back. This occurred on only two occasions in FY 1980. Petitioner rarely found itself in a position in which it neither required additional cash nor had temporary surplus working capital.

Beginning on September 7, 1979, and continuing through the end of FY 1980, petitioner was in a position in which it had temporary surplus working capital, in varying amounts. Petitioner used these temporary surpluses to purchase short-term instruments from the First National Bank. It purchased commercial paper of the holding company of the First National Bank, and certificates of deposit of the First National Bank. On a few occasions during FY 1980, petitioner entered into repurchase agreements or purchased Treasury bills through the First National Bank. During FY 1980, petitioner made 136 separate purchases of interest-bearing instruments. Ninety-eight of these transactions, or 72 percent, were overnight or overweekend transactions. Twenty-eight of such purchases, or 21 percent, were for a week or less, mostly overweekend, with an extra day tacked on at one end of the weekend. The remaining 10 transactions were for more than a week. Of these 10, 4 took place in December when petitioner was confident that its member companies would not want their funds until January.

The reason for the high level of overnight transactions was that petitioner did not know when it would need the temporary surplus working capital in its business. Petitioner was making daily judgments that, for the most part, it would need its surplus working capital on its next business day. If petitioner had been willing to purchase short-term instruments with longer maturities, it would have been able to earn a higher rate of interest. The rates of interest for commercial paper were going up during this period of time.

Petitioner never considered using its temporary surplus working capital to pay off any long-term debt. Since its long-term debt agreements with the St. Louis Bank required that any prepayment of principal be applied to the last principal payment due under the note, any such prepayment by petitioner would not have reduced its current level of payments on the long-term debt.

Petitioner likewise never considered leaving its temporary surplus working capital in a non-interest-bearing account, or distributing such excess working capital to its members. Given petitioner's state of under capitalization, and its chronic need for short-term funds, either practice would have been viewed with extreme disfavor by the First National Bank of Chicago as evidencing poor financial management on the part of petitioner. Since the First National Bank was an important source of credit and funds, petitioner considered it important to maintain and strengthen its relationship with the bank.

On its books, petitioner netted its interest income against interest expense. The actual figures on its financial statements for FY 1980 were interest expense of $1,592,000, interest income of $744,000, or net interest expense of $847,000. In its tax return for FY 1980, however, petitioner listed *gross* income from interest from a number of sources, one of which was $585,490.22 from "commercial paper, certificates of deposit, repurchase agreements, treasury notes."

Petitioner's return for FY 1980 treated all its net income as derived from its cooperative grain marketing activity, that is to say, as patronage-sourced income. Petitioner then allocated such income between member business and nonmember business on the basis of the quantity of grain sold for members and the quantity of grain sold for nonmembers. Petitioner then paid patronage refunds to its members in the amount of $3,304,253.04. Of this amount, $663,078.04 was paid in cash and $2,641,175 was paid in petitioner's stock. The patronage refunds paid by petitioner to its members with respect to its fiscal year 1980 were: (a) Paid on the basis of the quantity or value of business done with or for patrons; (b) paid under an obligation of petitioner to pay such patronage refunds, which obligation existed before it received the amount so paid; (c) actually paid on or before the 15th day of the ninth month following the close of FY 1980; and (d) paid entirely in cash and "qualified written notices of allocation," as that term is defined in section 1388(c).

Upon audit of petitioner's return, respondent determined, inter alia, that $213,795 of petitioner's patronage dividend

exclusion under section 1382(b) was not allowable because such amount was "attributable to income not derived from patronage sources and therefore is not deductible." Respondent has now agreed that the correct amount of such disallowance should be $143,359. Included in this figure is respondent's determination that the interest which petitioner earned on the short-term debt instruments which it purchased, in the net amount of $324,435, as well as the barge lease income, in the net amount of $7,179, was not derived from patronage sources and accordingly was not eligible for distribution as a patronage refund.

## ULTIMATE FINDING OF FACT

The interest income which petitioner received from the purchase of short-term debt instruments, as well as the rentals from its two barges, was derived from business done with or for petitioner's patrons.

## OPINION

The principal question which we must decide in this case is whether certain income earned by petitioner was derived from patronage sources within the meaning of subchapter T of the Internal Revenue Code. More specifically, was the income in question derived by petitioner from "business done with or for [its] patrons," within the meaning of section 1388(a)(1)?

The question is of unique importance in the taxation of cooperatives, and of nonexempt or taxable cooperatives in particular. In general, all cooperatives, whether so-called "exempt" cooperatives under section 521, or so-called "nonexempt" or "taxable" cooperatives, are taxed in the same fashion as any other corporation. Secs. 1381(b), 1382(a).[2] Such cooperatives, however, are entitled to certain additional deductions, not available to other taxpayers, in

---

[2]Certain special types of cooperatives are not included within the ambit of subch. T. Thus, certain mutual savings banks and building and loan associations are taxed under the special provisions of part II of subch. H and certain insurance companies are specially taxed under the provisions of subch. L. Such companies, together with cooperatives furnishing electrical energy or providing telephone service to persons in rural areas, are excluded from the provisions of subch. T. Sec. 1381(a)(2).

the computation of their net taxable income.[3] Among these additional allowable deductions, available to both exempt and nonexempt cooperatives, is that provided by section 1382(b)(1), which states:

SEC. 1382(b). PATRONAGE DIVIDENDS AND PER-UNIT RETAIN ALLOCA-TIONS.—In determining the taxable income of an organization to which this part applies, there shall not be taken into account amounts paid during the payment period for the taxable year—

(1) as patronage dividends (as defined in section 1388(a)), to the extent paid in money, qualified written notices of allocation (as defined in section 1388(c)), or other property (except nonqualified written notices of allocation (as defined in section 1388(d))) with respect to patronage occurring during such taxable year;* * *[4]

Section 1388(a) defines patronage dividend as follows:

SEC. 1388(a). PATRONAGE DIVIDEND.—For purposes of this subchapter, the term "patronage dividend" means an amount paid to a patron by an organization to which part I of this subchapter applies—

(1) on the basis of quantity or value of business done with or for such patron,

(2) under an obligation of such organization to pay such amount, which obligation existed before the organization received the amount so paid, and

(3) which is determined by reference to the net earnings of the organization from business done with or for its patrons.

Such term does not include any amount paid to a patron to the extent that (A) such amount is out of earnings other than from business done

[3]"Profits" and "income" are considered somewhat "dirty" words in the cooperative fraternity. Consistent with the broad philosophy that cooperatives are intended to operate at cost, eliminating entrepreneur profit and returning their net earnings to their patrons on an equitable basis (see secs. 1382(b), 1388(a); see also I. Packel, The Organization and Operation of Cooperatives, sec. 2 (4th ed. 1970)), cooperatives tend to eschew the words "profits" and "income," preferring instead the more delicate terms "margins" and "savings." Under the iron rod of the Internal Revenue Code, however, and subch. T in particular, cooperatives do have taxable income, particularly where, as here, the cooperative elects to distribute patronage dividends only to its member patrons. The balance of a cooperative's income, not so distributed to patrons on a patronage basis, sec. 1388(a), is fully taxable, whether patronage-sourced or not.

In *Farm Service Cooperative v. Commissioner*, 619 F.2d 718, 723 (8th Cir. 1980), revg. 70 T.C. 145 (1978), the Court of Appeals said:

"A nonexempt cooperative is a hybrid business organization, taxed like an ordinary corporation with respect to nonpatronage-sourced income (see subchapter C, IRC 301 *et seq.*), but like a partnership with respect to patronage-sourced income. * * * That is to say, nonpatronage-sourced income is fully taxable to the cooperative and, if paid out in dividends to the patron, to him as well. Patronage-sourced income is taxed only once, usually to the patron."

[4]Certain other additional deductions are provided for all cooperatives in sec. 1382(b), and further additional deductions are provided for exempt cooperatives under sec. 1382(c). We are not concerned with those special deductions here.

with or for patrons, or (B) such amount is out of earnings from business done with or for other patrons to whom no amounts are paid, or to whom smaller amounts are paid, with respect to substantially identical transactions.

What, then, is the meaning of the phrase "business done with or for such patron," or, as the synonymous phrase has evolved, "income from patronage sources"? The Code provides no definition, and the legislative history of the subchapter T provisions is not helpful. The sole guidance to be found in respondent's regulations is one which undertakes to define the concept in negative terms, that is to say, by attempting to give a definition of that which is *not* patronage income. Thus, in attempting to define income "from sources other than patronage" under section 1382(c)(2), respondent's regulations provide:

(2) *Definition.* As used in this paragraph, the term "income derived from sources other than patronage" means incidental income derived from sources not directly related to the marketing, purchasing, or service activities of the cooperative association. For example, income derived from the lease of premises, from investment in securities, or from the sale or exchange of capital assets, constitutes income derived from sources other than patronage. [Sec. 1.1382-3(c)(2), Income Tax Regs.]

Although the above-quoted language appears in respondent's regulations with respect to a Code provision of exclusive application to exempt cooperatives—section 1382(c)—it appears to be generally accepted that this definitional attempt is of equal application to both exempt and nonexempt cooperatives.

In spite of the apparently clear language of the regulation, however, the law, as it has developed, shows that the language does not always mean what it literally says. Both respondent and the courts have played a hand in this evolution of the law, as we shall see.

Thus, in the case of interest, both the courts and respondent have acknowledged that interest income may have the quality of income from patronage sources, depending upon the circumstances. *Cotter & Co. v. United States*, 765 F.2d 1102 (Fed. Cir. 1985); *St. Louis Bank for Cooperatives v. United States*, 224 Ct. Cl. 289, 624 F.2d 1041 (1980); Rev. Rul. 74-160, 1974-1 C.B. 245. Dividend income has sometimes likewise been held to be patronage-sourced.

*Land O'Lakes, Inc. v. United States*, 675 F.2d 988 (8th Cir. 1982); *Linnton Plywood Association v. United States*, 410 F. Supp. 1100 (D. Ore. 1976); Rev. Rul. 75-228, 1975-1 C.B. 278. Rental income has also been held to be patronage-sourced, on occasion. *Cotter & Co. v. United States, supra*; Rev. Rul. 63-58, 1963-1 C.B. 109 (semble); and some capital gains income has been held to be income from patronage sources, under the circumstances presented in the particular case. *Astoria Plywood Corp. v. United States*, an unreported case (D. Ore. 1979), 43 AFTR 2d 79-1114, 79-1 USTC par. 9197; contra Rev. Rul. 74-160, 1974-1 C.B. 245.

Is there any touchstone or common thread running through these various cases and rulings which enables them, with their facial inconsistency, to be reconciled with their facial inconsistency with the language of respondent's regulation quoted above? We think it can be found in one of respondent's own pronouncements.

In Rev. Rul. 69-576, 1969-2 C.B. 166, the taxpayer, a nonexempt farmers cooperative, borrowed money from a bank for cooperatives, itself a cooperative. The money was borrowed to finance the acquisition of agricultural supplies for resale by the taxpayer to its members. The taxpayer cooperative paid interest to the bank on this loan. After the close of the year, the cooperative bank determined its net margins or savings from business done with borrowers, and paid to the taxpayer, as a patronage dividend, its ratable and patronage share of the interest income thus earned. The taxpayer cooperative, in turn, included the amount of such patronage dividend in the patronage distribution which it made to its member patrons. In holding that this patronage dividend from the cooperative bank should be considered as patronage-sourced income in the hands of the taxpayer cooperative, respondent ruled:

The classification of an item of income as from either patronage or nonpatronage sources is dependent on the relationship of the activity generating the income to the marketing, purchasing, or service activities of the cooperative. If the income is produced by a transaction which actually facilitates the accomplishment of the cooperative's marketing, purchasing, or service activities, the income is from patronage sources. However, if the transaction producing the income does not actually facilitate the accomplishment of these activities but merely enhances the overall profitability of the cooperative, being merely incidental to the

association's cooperative operation, the income is from nonpatronage sources.

Accordingly, inasmuch as the income received by the nonexempt cooperative from the bank for cooperatives resulted from a transaction that financed the acquisition of agricultural supplies which were sold to its members, thereby directly facilitating the accomplishment of the cooperative's purchasing activities, it is held that the allocation and payment of this same amount by the nonexempt farmers' cooperative to its own patrons (farmers) qualifies as a patronage dividend. * * *

[Rev. Rul. 69-576, 1969-2 C.B. 167.]

Analysis of the relevant cases under the above standard shows that they can be reconciled. What is revealed is that the courts (if not respondent) have consistently resolved the cases before them, based upon an application of the principles of Rev. Rul. 69-576 to the facts at hand.

In *Astoria Plywood Corp. v. United States, supra,* the taxpayer cooperative leased a plant facility in which it conducted its cooperative activity of manufacturing plywood. When the landlord canceled the lease, it made a lease cancellation payment of $50,000 to the taxpayer. Holding that the use of the plant facilities to manufacture plywood was directly related to the taxpayer's cooperative activities, the court held that the income from the cancellation of the lease (arguably to be classified as capital gain income) was nevertheless income from patronage sources and was eligible for distribution as a patronage dividend. In so holding, the court clearly disapproved, without mentioning it by name, the provisions of Rev. Rul. 74-160, *supra,* which held to the contrary.

In *Linnton Plywood Association v. United States, supra,* the taxpayer cooperative, together with another cooperative, organized a third corporation, in which the taxpayer owned a 50-percent interest, for the purpose of making glue which the two cooperatives used in their business of making plywood. The court held that the dividends received by taxpayer from the 50-percent-owned subsidiary were patronage-sourced income, since such income was directly related to the cooperative's business, in which glue was an essential element. In this case, it is noteworthy that there was no suggestion that the glue could not have been obtained from any other source.

In *Land O'Lakes, Inc. v. United States, supra,* the taxpayer, a dairy marketing cooperative, borrowed money from the St. Paul Bank for Cooperatives in order to finance its cooperative business. In order to be eligible to borrow from the bank, the taxpayer had to buy a certain amount of stock in the bank. Dividends received on such stock by the taxpayer were distributed to its member patrons on a patronage basis, an action which the Commissioner disallowed on the basis that the dividend income was not patronage-sourced pursuant to section 1.1382-3(c)(2), Income Tax Regs. The court held, however, that the purchase of the bank's stock actually facilitated the cooperative business by making favorable financing available to it, and thus the dividends received were patronage-sourced. In so holding, the court cited with approval and appears to have clearly adopted the rationale of Rev. Rul. 69-576 and Rev. Rul. 74-160.

In *Twin County Grocers, Inc. v. United States,* 2 Cl. Ct. 657 (1983), the taxpayer was a nonexempt cooperative, serving as a purchasing, warehousing, and distribution facility for the goods sold by its member patrons. On occasion, when it had temporary surpluses in its cash, above immediate needs, the taxpayer invested such funds in short-term certificates of deposit and earned interest thereon, which it distributed to its member patrons as part of its patronage dividends.

In upholding the Government's disallowance of these distributions on the ground that the interest income was not patronage-sourced, the Claims Court emphasized what it considered to be the lack of a sufficiently direct relationship between the lending of surplus funds and the principal business of the cooperative. Thus, the court found that there was little if any connection between the cooperative's money management and the services which the cooperative provided to its patrons, and that there was no direct connection between the short-term loans and the cooperative activity of buying, storing, and distributing merchandise. The court rejected a test which would have qualified the income as patronage-sourced simply because it was used to enhance the profitability of the business as a whole. In so holding, it seems clear that the court was accepting and

following the rationale of Rev. Rul. 69-576, and, in its own wisdom, was applying it to the facts of the case before it.

In *St. Louis Bank for Cooperatives v. United States*, *supra*, the taxpayer was a nonexempt cooperative bank, whose business was to make loans to other cooperatives. The taxpayer's source of funds, with which it made loans to other cooperatives, in addition to a certain amount of equity capital, was derived from long-term debt which it issued itself and short-term borrowings from the Central Bank for Cooperatives, as well as from commercial banks and from other farm credit banks. During the period in question, its primary source of funds was its long-term debt, and the Central Bank for Cooperatives was relied upon as the primary supplier of short-term borrowings.

The St. Louis Bank was constantly engaged in managing its funds so that it would have sufficient funds on hand to lend to eligible cooperatives. Such needs fluctuated widely on a very short-term basis. The taxpayer attempted to make provision for its necessary funds on a daily basis, but it sometimes resulted that it had a deficit in its necessary available cash, while at other times it found it was in a surplus position with respect to available cash. These surplus or deficit positions resulted from overestimating the needs of its borrowers, or underestimating those needs. Its cash position was rarely in balance, although it was more often in a deficit position than otherwise, and frequently had to borrow funds on a short-term basis.

During the years before the Court, when the taxpayer found it had funds available that were temporarily surplus to its needs, it normally loaned the funds on a demand basis to the Central Bank for Cooperatives or, on several occasions, to other farm credit banks in its district, in compliance with established policy to encourage intersystem use of surplus funds. In a few cases, it loaned funds on a short-term basis to commercial houses under repurchase agreements. Such loans were always on a demand or short-term basis in order to assure availability to the taxpayer in the event it was determined that such funds were needed to cover advances to eligible borrowers.

The taxpayer treated the interest which it made on its short-term loans of the surplus funds as patronage-sourced

income, and included it in the amounts which it distributed to its patrons on a patronage basis. The Government took the position that such interest income was not patronage-sourced, in that the loans were not made to the taxpayer's patrons, nor made for them. On the contrary, the Government contended that the placement of the taxpayer's temporary surpluses in short-term and demand instruments was not integrally related to the conduct of the cooperative business and was therefore to be classified as nonpatronage-sourced income not eligible for distribution as patronage dividends.

The Court of Claims rejected the Government's position in this case, and in so doing, clearly embraced the directly related standard of Rev. Rul. 69-576. It held that the taxpayer's placement of temporary surpluses in short-term loans was "integrally intertwined" with the taxpayer's cooperative business of managing its money supply. It held that such short-term placements were not "investments" but simply constituted the prudent and correct management of the taxpayer's money which was directly related to the conduct of its cooperative business. As the court said:

Interest income from bonds plaintiff held for liquidity purposes is patronage sourced because the transactions involved are directly related to plaintiff's services to its patrons. They were a prerequisite to plaintiff's functions. Unless the bonds were held, plaintiff could not issue consolidated bonds, the primary source of loan funds for its patrons. [*St. Louis Bank for Cooperatives v. United States*, 624 F.2d at 1053.]

Finally, we consider the case of *Cotter & Co. v. United States, supra.* In that case, as in the instant case, the taxpayer had two sources of funds which were challenged as not being patronage-sourced. The taxpayer was a nonexempt cooperative engaged in the business of purchasing, manufacturing, and distributing to its patron members hardware and related goods in large volume. In the conduct of the enterprise, it was essential that the taxpayer have cash available, either through short-term borrowings or cash on hand, in order to finance the volume purchase of goods which it later resold to its patron members. The taxpayer's business was seasonal, in that it made many of its purchases throughout the year, frequently some time before it resold the goods to its members. Because its payments to

its suppliers were frequently due before it received funds from its members, it was required to maintain substantial liquidity either from short-term borrowings or from cash on hand. It happened that at many times during the year, the taxpayer had a working capital deficit, whereas at other times, it had surpluses of cash in excess of its immediate needs. At all times, however, the retention of sufficient liquidity was essential to the proper conduct of its business.

When the taxpayer had temporary surpluses of cash, it followed the practice of paying down short-term loans or prepaying bills. When these measures had been exhausted, it followed the practice of placing its temporary cash surpluses in short-term commercial paper. The Claims Court found that the taxpayer's money management practices in this respect were directly related to its cooperative activity and were an inseparable part thereof. The Government, however, disallowed the interest income earned by the taxpayer from the short-term placement of its funds on the ground that such actions were merely a passive investment of surplus funds, which had no purpose except to enhance the overall profitability of the cooperative. Accordingly, the Government urged (and the Claims Court below found) that the interest income earned by the taxpayer was not patronage-sourced nor eligible for distribution as patronage dividend.

The Federal Circuit reversed the Claims Court in this matter, and in so doing, it clearly adopted the directly related test of Rev. Rul. 69-576, as well as the rationale of the Court of Claims in *St. Louis Bank for Cooperatives v. United States*, *supra*, and that of the Court of Appeals of the Eighth Circuit in *Land O'Lakes v. United States*, *supra*. In following the lead of the Court of Claims in *St. Louis Bank*, the Federal Circuit held that the directly related principle employed was not to be applied only to money-management activities of cooperatives engaging in the banking business. As the court said, to allow such a—

narrow focus, which considers the transaction without regard to the totality of the circumstances, would allow the surgical removal of one of a series of transactions from the economic realities that necessitated it. Consideration of the relatedness of a transaction to a cooperative's function must be undertaken by viewing the business environment to

which it is arguably related. * * * The activity producing the income may not be so narrowly defined as to limit it only to its income-generating characteristic *when such a characterization is not consistent with the actual activity.* [*Cotter & Co. v. United States*, 765 F.2d at 1106-1107. Emphasis in original.]

The Federal Circuit went on to say:

Cotter, acting as any reasonable business person, reduces the cost of this money while retaining its necessary availability by keeping short-term commercial paper. Its actions are akin to placing its funds in a bank account. Cotter's activity, viewed in the context of its business activity, cannot be considered an action enhancing overall profitability; merely to enhance profitability Cotter would pay off its debt or take other more profitable action. Rather, Cotter acts to retain its liquidity in a manner of any reasonable business person. Its actions are similar to those undertaken by taxpayer in *St. Louis Bank*. [765 F.2d at 1107.]

The Court of Appeals accordingly held that the incidental interest income earned by the taxpayer cooperative from the short-term placement of its temporary surpluses was directly related to and actually facilitated the cooperative enterprise within the meaning of Rev. Rul. 69-576. As a result, such income was considered as patronage-sourced and eligible for distribution as a patronage dividend.

The second issue involved in the *Cotter* case involved rental income. The taxpayer required substantial amounts of warehouse space, in the conduct of its cooperative business, to store merchandise which it had acquired or manufactured and which it had not yet shipped to its patron members. The business was experiencing rapid growth, and the cooperative realized that it had a need for additional warehouse space, which would increase even further in the future. It accordingly designed and had built, or leased, additional warehouse space, including some excess space which it anticipated it would need in the future. In the meantime, it leased out its temporarily excess warehouse space, and derived some minor rental income therefrom.

Here, as in the case of the interest income, the Government contended that the taxpayer's rental income from leases of excess warehouse space was not directly related to its cooperative enterprise and should be considered as nonpatronage-sourced income, apparently relying on the quoted regulation. The Claims Court upheld the Govern-

ment's position, but once again the Court of Appeals reversed, saying:

> The rental income earned through the leasing out of temporarily excess space is also patronage sourced. The stipulated facts clearly show that renting temporarily excess space was only a minor component of taxpayer's plan for making certain that Cotter had sufficient warehouse and manufacturing space. Architects do not as yet provide warehouses with accordion pleated walls that may be expanded or contracted in strict conformity to the owner's needs. * * * It is clear from the undisputed facts that Cotter did not go into the warehouse rental business, seeking to enhance corporate profits while hiding behind its label as a cooperative. Indeed, Cotter occasionally must lease space from others as well. Rather, Cotter implemented a reasonable plan to secure the warehousing of its goods at the lowest cost to its patrons; the result is a primary function of Cotter's. [765 F.2d at 1109-1110.]

A review of the statutory provisions, the decided cases in the area and, indeed, respondent's announced position on the subject, as embodied in Rev. Rul. 69-576, leads us to the conclusion that in this case, the petitioner must prevail as to both types of income here in issue. As the cases make clear, such a determination is necessarily fact-intensive. Income derived by a cooperative from its various business activities may indeed be so closely intertwined and inseparable from the main cooperative effort that it may be properly characterized as directly related to, and inseparable from, the cooperative's principal business activity, and thus can be found to "actually facilitate" the accomplishment of the cooperative's business purpose. On the other hand, it is equally possible that a cooperative may undertake business activities which, while profitable, have no integral and necessary linkage to the cooperative enterprise, so that it may fairly be said that the income from such activities does nothing more than add to the taxpayer's overall profitability. It all depends on the facts of each case. In the instant case, we consider the facts with respect to each type of income separately.

### 1. *The Interest Income*

The facts in this case show that petitioner's principal cooperative enterprise was the marketing of its patrons' grain. The financing of this enterprise was complex and called for petitioner's constant attention and management

of its money so as to have available on short notice large amounts of cash to meet margin calls, to repay members' notes, to satisfy patrons' demands under the deferred pricing arrangements which petitioner had with its patrons, and to pay its current bills. On the other hand, petitioner received funds, not entirely on a predictable basis, from sales (reducing its inventories), and from lessening margin requirements (which fluctuated on a daily basis), as well as from its long-term and short-term borrowings. Although petitioner analyzed its cash needs on a daily basis, it could not always be precise. On some days, petitioner had to exercise its short-term line of credit to borrow from the First National Bank or the St. Louis Bank. On other days, petitioner would find itself in a surplus cash position. When the latter event occurred, petitioner, in the exercise of ordinary prudent business management, placed its temporary surplus funds in extremely short-term debt instruments—for the most part, overnight or overweekend loans to the First National Bank, or its wholly owned subsidiary. The primary purpose here was not to "invest," but to find a temporary parking place for its surplus funds, consistent with safety and prudent money management. We do not agree with respondent's contention that such placement of temporary surplus funds in short-term debt instruments constituted an "investment" of such funds, as that term would generally be understood. Petitioner's actions here were entirely comparable to placing the funds in a bank account. One does not make an "investment" in a bank account. The rate of interest which petitioner earned on these extremely short-term placements was less, as we have found, than the interest which petitioner could have earned elsewhere on longer-term debt instruments.

In short, we are convinced that petitioner's money management activities in this case were inseparably intertwined with the overall conduct of its cooperative enterprise, and the interest income which it earned was therefore patronage-sourced, to the same extent as in the *Cotter* and *St. Louis Bank* cases.

## 2. *The Barge Rental Income*

The facts here show that petitioner relied heavily upon river barges to transport its patrons' grain to market. In fact, in the period before us, over half of petitioner's grain went to market in this fashion. Petitioner operated no barges itself to transport its members' grain, but over the years had relied on various barge companies to perform this service. In order to secure an adequate supply of barges for the transport of its grain, petitioner, some years prior to the year in issue, had caused four barges to be constructed, which it then leased from the Northwestern Mutual Life Insurance Co. as owner, and subleased to whichever barge company was performing the transportation function for it. We assume that it paid the normal transportation costs for the barging of its grain, and that the barge company to whom it subleased its barges likewise paid a fair and arm's-length rental; respondent herein does not contend otherwise.

By the time of the year here in issue, petitioner's four barges had dwindled to two, which were subleased by petitioner to a barge transportation cooperative of which it was a member-patron. Although, as we have found, petitioner did not exercise direct control over the use to which the barges were put, it was clearly in petitioner's interest to see to it that the barge company had an adequate supply of bottoms in which to transport petitioner's grain. We can find no distinction here between petitioner's actions in providing barges to ATC, and its actions in leasing 400 covered railroad hopper cars to provide a supply of such cars for the shipment of its grain by rail, handled by various railroads, a situation as to which respondent has raised no question.

Here, again, as in the case of petitioner's interest income, we are satisfied that petitioner's leasing and subleasing of barges to its transportation cooperative was not an "investment" in such barges, intended to produce merely passive rental income, but was an integral part of its overall cooperative activity in moving its patrons' grain to market. The provision of such barges by petitioner to ATC may not have been a significant factor in the ability of ATC to move petitioner's grain, given the fact that there were only two

barges left by the year in issue, but we think it was clearly linked to petitioner's principal cooperative enterprise, and was not entered into as an independent and unrelated profit-making activity. We accordingly hold that the barge rentals which petitioner derived in the year in issue were patronage-sourced income, within the rationale of Rev. Rul. 69-576, and consistent with the philosophy expressed in the *Cotter* case.

In opposition to petitioner's position herein, respondent argues strenuously that the Federal Circuit went too far in *Cotter*, and that the standard enunciated in that case opens the door to a cooperative claiming that any income it earns, from whatever activity, can be qualified as patronage-sourced income simply because it improves a cooperative's overall profitability. Thus, according to respondent, if we follow *Cotter*, every "car wash" or "bake sale" sponsored by a cooperative will produce income from patronage sources, simply because the net proceeds are used in the cooperative's business.

We think that respondent's concerns are considerably overblown. In our view, the Federal Circuit in *Cotter* clearly was aware of the danger of an indiscriminate application of its interpretation of subchapter T. It addressed this concern in these words:

> We agree with the Claims Court that Congress did not intend the term "with or for patrons" to be "of unlimited scope, [so that] *all* income produced by cooperatives that is passed through to patrons would be, in essence, income obtained *for* patrons, and would, therefore, be considered patronage sourced." *Cotter*, 6 Cl. Ct. at 227. A cooperative cannot merely "clothe its shareholders as patrons and its corporate dividends as patronage payments" and retain the benefits of Subchapter T. *Mississippi Valley*, 408 F.2d at 835. But Subchapter T was also not enacted to require that a cooperative acting for its patrons function in an economically unreasonable manner or penalize it for acting reasonably. Considering the income-generating transaction in its relation to all the activity undertaken to fulfill a cooperative function will allow courts to distinguish from cooperative activity transactions which merely enhance overall profitability in a manner incidental to cooperative function. Such activity is not to receive the benefits of Subchapter T, but other activity, which does directly relate to cooperative function when considered in its actual business environment, cannot properly be considered outside "business done with or for patrons." * * * [765 F.2d at 1110.]

We repeat that every case of this nature must necessarily turn upon its own facts. The same activities which may be directly related to the cooperative enterprise in one case may not be so directly related in another case. It all depends upon the nature of the cooperative effort, and the way the cooperative conducts its business. In the instant case, we do not think petitioner did anything different with respect to managing its short-term funds than any other business enterprise would have done, consistent with skilled professional money management. Respondent would appear to require that petitioner do something less than this in order to secure the benefits of subchapter T. We do not think the law requires this, and commonsense indeed dictates otherwise. As we said in *Associated Milk Producers, Inc. v. Commissioner*, 68 T.C. 729, 736 (1977):

> We consider respondent's position herein not only contrary to the [law], but conceptually strained and lacking any fundamental policy support; in short, an unwarranted tinkering with the tax structure applicable to cooperatives. * * *

Holding in favor of petitioner on the primary issue presented, it therefore becomes unnecessary for us to consider the second issue.

*Decision will be entered under Rule 155.*