T.C. Memo. 2019-161

UNITED STATES TAX COURT

GROWMARK, INC. & SUBSIDIARIES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23797-14.            Filed December 11, 2019.

<u>George William Benson</u> and <u>Andrew R. Roberson</u>, for petitioner.

<u>Justin D. Scheid</u>, <u>Rogelio A. Villageliu</u>, and <u>Tess deLiefde</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Respondent issued a notice of deficiency to petitioner

determining deficiencies of $461,696 and $2,958,319 for 2009 and 2010,[1]

---

[1]Because petitioner's taxable year begins on September 1 and ends on
August 31, the taxable years in issue ran from September 1, 2008, to August 31,
2010.  For ease of discussion the Court will refer to the taxable years in issue as

(continued...)

[*2] respectively. Petitioner challenged respondent's adjustments in the notice of deficiency. Petitioner also asserted in its petition that it is entitled to reduce its taxable income by $6,938,292 and $7,329,491 for 2009 and 2010, respectively, arguing that it incorrectly calculated its cost of goods sold (COGS) for each year using its net excise tax liabilities.[2]

After concessions,[3] the issues for decision are: (1) whether petitioner must compute its section 199 domestic production activities deduction (DPAD) separately for patronage and nonpatronage activities, (2) if separate computations are not required, whether petitioner may use its DPAD to offset any of its taxable income or must allocate its DPAD between its patronage and nonpatronage accounts, (3) if allocation is required, the proper method of allocation, and (4) whether the alcohol fuel and biodiesel mixture credits under section 6426(b) and

---

[1](...continued)
2009 and 2010. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court's Rules of Practice and Procedure.

[2]The correct calculation of petitioner's COGS--and its entitlement to reduce its taxable income accordingly--will be addressed in a separate opinion.

[3]On November 25, 2015, the parties filed a stipulation of settled issues agreeing to certain adjustments to petitioner's expenses and income for 2009 and 2010. These settled issues are binding in the parties' Rule 155 computations.

**[*3]** (c) reduce excise taxes for purposes of petitioner's COGS calculation. The fourth issue will be decided in a separate opinion.

FINDINGS OF FACT

I.      Background

Petitioner is an affiliated group of corporations comprising Growmark, Inc. (Growmark), and multiple subsidiaries. For Federal income tax purposes petitioner files a consolidated return. When petitioner timely filed its petition, its principal place of business was in Illinois.

Growmark is an agricultural cooperative that sells fuels, lubricants, plant nutrients, crop protection products, seed, structures, and equipment. Growmark also provides grain marketing assistance and other services. Growmark is member owned, and its members include farmer cooperatives and individual farmers. Growmark does business with its members and certain nonmembers (collectively, patrons) on a patronage basis. Patrons are eligible to share in patronage dividends paid by Growmark. Growmark does business with all other nonmembers (nonpatrons) on a nonpatronage basis, and nonpatrons are not eligible to share in patronage dividends.[4]

_____

[4]Sec. 1.1388-1(e), Income Tax Regs., provides that "patron" includes "any person with whom or for whom the cooperative association does business on a

(continued...)

**[*4]** For Federal income tax purposes Growmark is a corporation operating on a cooperative basis to which part I of subchapter T applies (subchapter T cooperative). Growmark is a nonexempt subchapter T cooperative and a specified agricultural or horticultural cooperative within the meaning of section 199(d)(3)(F).

II.    Tax Returns

In 2009 and 2010 Growmark operated its business through several divisions, each of which conducted business on a patronage basis with patrons and on a nonpatronage basis with nonpatrons. Growmark also had an investment operations division that it treated as nonpatronage. Growmark conducted other activities on a nonpatronage basis through wholly owned subsidiaries. The divisions of Growmark relevant to petitioner's 2009 and 2010 DPAD computations were (1) Growmark's grain division, through which it marketed grain for its member cooperatives and nonpatrons, and (2) the lubricant business conducted by the energy department of Growmark's wholesale supplies division, which was involved in the procurement, marketing, and distribution of refined and renewable fuels, lubricants and greases, and other energy products.

---

[4](...continued)
cooperative basis, whether a member or a nonmember of the cooperative association".

**[\*5]** A.    2009 Return

Growmark, acting as agent for petitioner's consolidated return group, timely filed (with an extension) Form 1120-C, U.S. Income Tax Return for Cooperative Associations, for 2009. Petitioner computed the DPAD for its expanded affiliated group (EAG),[5] which for 2009 included (1) Growmark, (2) Seedway, LLC (Seedway), a seed company wholly owned by Growmark treated as a disregarded

---

[5]Sec. 199(d)(4) provides a special rule for an EAG's DPAD computation and the allocation of the EAG's DPAD among its members:

> (4) Special rule for affiliated groups.--
>
>   (A) In general.--All members of an expanded affiliated group shall be treated as a single corporation for purposes of this section.
>
>   (B) Expanded affiliated group.--For purposes of this section, the term "expanded affiliated group" means an affiliated group as defined in section 1504(a), determined--
>
>     (i) by substituting "more than 50 percent" for "at least 80 percent" each place it appears, and
>
>     (ii) without regard to paragraphs (2) and (4) of section 1504(b).
>
>   (C) Allocation of deduction.--Except as provided in regulations, the deduction under subsection (a) shall be allocated among the members of the expanded affiliated group in proportion to each member's respective amount (if any) of qualified production activities income.

[*6] entity for Federal income tax purposes that produced and marketed seed and that operated on a nonpatronage basis, (3) AgVantage FS, Inc. (AgVantage), a company that marketed and sold farm supplies and grain and that operated on a nonpatronage basis, and (4) FS Financial Services Corp. (FS Financial), a wholly owned subsidiary of Growmark that provided insurance brokerage services and operated on a nonpatronage basis.

In completing its Form 1120-C for 2009 petitioner allocated Growmark's domestic production gross receipts (DPGR), see sec. 199(c)(4) (defining "domestic production gross receipts"), and the wages it reported on Form W-2, Wage and Tax Statement (W-2 wages), between the patronage and nonpatronage columns on its Schedule G, Allocation of Patronage and Nonpatronage Income and Deductions. Growmark did not split its business operations on the basis of patronage and nonpatronage activities, nor did it dedicate specific assets or persons to patronage and nonpatronage activities. On Schedule G petitioner allocated items between the patronage and nonpatronage columns on the basis of the volume of business done with members. Seedway and AgVantage operated on a nonpatronage basis for 2009, and petitioner reported their DPGR and W-2 wages in the nonpatronage column on Schedule G.

[*7] For 2009 Growmark was a member of three different limited liability companies (LLCs) from which it received distributive shares of qualified production activities income (QPAI) and W-2 wages. See sec. 199(c)(1) (defining "qualified production activities income"). For 2009 Growmark held an interest in each of the following LLCs: (1) Pro-Pet, LLC (Pro-Pet), from which Growmark purchased pet food that it resold to patrons on a patronage basis and to nonpatrons on a nonpatronage basis, (2) Allied Seed, LLC (Allied Seed), from which Growmark purchased seed that it resold to patrons on a patronage basis and to nonpatrons on a nonpatronage basis, and (3) Mid-America Biofuels, LLC (Mid-America Biofuels), which produced biofuels for sale to customers. For 2009 neither Growmark nor any other member of petitioner's EAG purchased biofuel from Mid-America Biofuels for resale to patrons on a patronage basis. On Schedule G petitioner allocated Growmark's distributive shares of QPAI and W-2 wages from Pro-Pet and Allied Seed between the patronage and nonpatronage columns on the basis of the volume of business conducted with members in each product line. All of Growmark's distributive shares of QPAI and W-2 wages from Mid-America Biofuels were assigned to the nonpatronage column.

For 2009 FS Financial, AgVantage, and New Century FS, Inc. (New Century), a wholly owned subsidiary of Growmark, held interests in various LLCs

[*8] from which they received distributive shares of QPAI and W-2 wages. On Schedule G petitioner reported all of those distributive shares in the nonpatronage column. Additionally, Growmark's grain division had W-2 wages attributable to FS Financial's ownership interests in the LLCs. Petitioner reported those W-2 wages in the nonpatronage column on Schedule G.

For 2009 Growmark made payments to patrons that qualified as per-unit retain allocations paid in money (PURPIMs) for purposes of sections 1382(b) and 1388. Petitioner reported the payments Growmark made to its patrons in the patronage column on Schedule G. Additionally, AgVantage received payments from other cooperatives that qualified as PURPIMs and reported those payments in the nonpatronage column on Schedule G. In computing its QPAI and taxable income for purposes of its DPAD computation, petitioner added back the PURPIMs Growmark paid and subtracted out the PURPIMs AgVantage received.[6]

In computing its 2009 DPAD petitioner did not separate any amounts as patronage and nonpatronage. Instead, it performed a single computation aggregating all amounts from the members of its EAG. Petitioner then allocated

---

[6]See infra pp. 13-14 for a discussion of the mechanics of a specified agricultural or horticultural cooperative's DPAD computation.

[*9] the total DPAD amount on Schedule G between the patronage and nonpatronage columns on the basis of QPAI.[7]

B.    2010 Return

Growmark, acting as agent for petitioner's consolidated return group, timely filed (with an extension) Form 1120-C for 2010.  Petitioner computed the DPAD for its EAG, which for 2010 included (1) Growmark, (2) Seedway, which operated on a nonpatronage basis, (3) the AgVantage grain division of Growmark,[8] which operated on a patronage basis, and (4) FS Financial, which operated on a nonpatronage basis.

In completing its Form 1120-C for 2010 petitioner allocated Growmark's DPGR and W-2 wages between the patronage and nonpatronage columns on its Schedule G on the basis of the volume of business done with members.  For 2010 all of the grain marketed by the AgVantage grain division was marketed for patrons on a patronage basis, and petitioner reported the AgVantage grain division's DPGR and W-2 wages in the patronage column on Schedule G.

_____

[7]Solely for purposes of this allocation petitioner separately computed a "patronage QPAI" and a "nonpatronage QPAI".  To compute each QPAI petitioner separated the elements of the DPAD computation into patronage and nonpatronage categories in accordance with the separation it used for Schedule G purposes.

[8]At the beginning of petitioner's taxable year 2010 AgVantage merged into Growmark.

[*10] Seedway operated on a nonpatronage basis for 2010, and petitioner reported its DPGR and W-2 wages in the nonpatronage column on Schedule G.

For 2010 Growmark received distributive shares of QPAI and W-2 wages from Pro-Pet, Allied Seed, and Mid-America Biofuels. Petitioner allocated Growmark's distributive shares of QPAI and W-2 wages from Pro-Pet between the patronage and nonpatronage columns on Schedule G on the basis of the volume of business conducted with members through the product line. All of Growmark's distributive shares of QPAI and W-2 wages from Allied Seed[9] and Mid-America Biofuels were assigned to the nonpatronage column on Schedule G. Additionally Growmark's grain division had W-2 wages attributable to FS Financial's ownership interests in the LLCs. Petitioner reported those W-2 wages in the nonpatronage column on Schedule G.

For 2010 FS Financial, the AgVantage grain division of Growmark, and the New Century retail division of Growmark held interests in various LLCs from which they received distributive shares of QPAI and W-2 wages. For 2010 petitioner did not operate on a patronage basis through any of the LLCs in which FS Financial, the AgVantage grain division, or the New Century retail division

[9]For 2010 Growmark sold seed purchased from Allied Seed on a nonpatronage basis.

[*11] held an interest. On Schedule G petitioner reported the distributive shares received by FS Financial, the AgVantage grain division, and the New Century retail division in the nonpatronage column.

During 2010 Growmark and the AgVantage grain division of Growmark made payments to patrons that qualified as PURPIMs, and they received payments from other cooperatives that qualified as PURPIMs. In 2010 an LLC in which FS Financial held an interest received payments that qualified as PURPIMs. In computing its QPAI and taxable income for purposes of its DPAD computation, petitioner added back the PURPIMs Growmark and the AgVantage grain division paid and subtracted out the PURPIMs they received. Petitioner also subtracted out its distributive share of the PURPIMs received by the LLC in which FS Financial held an interest. Petitioner included the PURPIMs Growmark and the AgVantage grain division paid and received in the patronage column on Schedule G. Petitioner included its distributive share of the PURPIMs received by the LLC in which FS Financial held an interest in the nonpatronage column on Schedule G.

In computing its 2010 DPAD petitioner did not separate any amounts as patronage and nonpatronage. Instead, it performed a single computation aggregating all amounts from the members of its EAG. Petitioner then allocated

**[*12]** the DPAD between the patronage and nonpatronage columns on Schedule G on the basis of QPAI.[10]

During 2010 petitioner received DPAD passed through from other cooperatives. On Schedule G petitioner did not allocate the passed-through DPAD between the patronage and nonpatronage columns as it did with the DPAD it generated. Instead, petitioner assigned the DPAD passed through from each cooperative to the patronage and nonpatronage columns on the basis of the nature of the relationship between petitioner and the cooperative.[11]

OPINION

I.    DPAD

Section 199 was added to the Internal Revenue Code by the American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 102(a), 118 Stat. at 1424, to provide a tax deduction for certain domestic production activities.[12] The

---

[10]Solely for purposes of this allocation petitioner separately computed a "patronage QPAI" and a "nonpatronage QPAI". To compute each QPAI petitioner separated the elements of the DPAD computation into patronage and nonpatronage categories in accordance with the separation it used for Schedule G purposes.

[11]For example, Growmark received DPAD from a cooperative from which it obtained fuel for resale to patrons on a patronage basis. Petitioner assigned that passed-through DPAD to the patronage column on Schedule G.

[12]The Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, sec. 13305(a) and
(continued...)

[*13] deduction is for an amount equal to a percentage[13] of the lesser of the taxpayer's QPAI or taxable income. Sec. 199(a). The taxpayer's DPAD cannot exceed 50% of the W-2 wages of the taxpayer for the taxable year. Sec. 199(b)(1).

A.    Computation

Section 199(d)(3) includes rules applicable to specified agricultural and horticultural cooperatives, which are exempt and nonexempt subchapter T cooperatives engaged in the manufacturing, production, growth, or extraction of any agricultural or horticultural product or in the marketing of agricultural or horticultural products. Sec. 199(d)(3)(F). Such cooperatives determine taxable income without regard to any deduction under section 1382(b) (relating to patronage dividends and per-unit retain allocations (PURAs)) or section 1382(c) (relating to nonpatronage distributions). Sec. 199(d)(3)(C).

Under section 199(d)(3)(C) a nonexempt specified agricultural or horticultural cooperative must compute its taxable income for purposes of its DPAD computation without regard to the deductions under section 1382(b) for

---

[12](...continued)
(c), 131 Stat. at 2126, eliminated sec. 199 for taxable years beginning after December 31, 2017.

[13]The DPAD was "phased in" beginning in 2005. For petitioner's taxable years 2009 and 2010 the allowable deduction was for an amount equal to 6% of the lesser of its QPAI or taxable income.

**[\*14]** patronage distributions and PURAs, whether paid in money as PURPIMs or in certificates.[14] The patron, then, disregards from its computation of taxable income for purposes of its own DPAD computation patronage distributions and PURAs it received from a cooperative. Sec. 1.199-6(l), Income Tax Regs.

The parties disagree about the proper method for computing petitioner's DPAD given Growmark's status as a nonexempt subchapter T cooperative. This Court recently addressed the proper method of computation for a nonexempt subchapter T cooperative's DPAD in Ag Processing, Inc. a Coop. & Subs. v. Commissioner (Ag Processing), 153 T.C. ___, ___ (slip op. at 38-46) (Oct. 16, 2019). This Court reviewed the text, purpose, and history of section 199 and concluded that section 199 does not require a nonexempt subchapter T cooperative to compute separate DPAD amounts for its patronage and nonpatronage activities. Ag Processing, 153 T.C. at ___ (slip op. at 44). There is no substantive difference between the nonexempt subchapter T cooperative in Ag Processing and Growmark that would lead the Court to conclude otherwise in this case. Therefore, petitioner

---

[14]This is commonly known as "adding back" patronage dividends and PURAs. Exempt subch. T cooperatives must also compute taxable income without regard to the deductions allowable under sec. 1382(c) relating to nonpatronage distributions.

**[\*15]** is not required to compute separate DPAD amounts for its patronage and nonpatronage activities.

### B. Allocation

Petitioner argues that it is entitled to use the full amount of DPAD against all income sources. Alternatively, petitioner argues that if it is required to allocate its DPAD between its nonpatronage and patronage accounts on Schedule G, it may do so using a reasonable method of allocation.

#### 1. Requirement

Under the general rules of subchapter T a cooperative must separate its patronage income and expenses/deductions from its nonpatronage income and expenses/deductions to compute the amount available for patronage dividends and to limit the use of its patronage losses. Farm Serv. Coop. v. Commissioner, 619 F.2d 718, 725 (8th Cir. 1980), rev'g 70 T.C. 145 (1978); see Ag Processing, 153 T.C. at ___ (slip op. at 43-44); Buckeye Countrymark, Inc. v. Commissioner, 103 T.C. 547 (1994); Certified Grocers of Cal., Ltd. v. Commissioner, 88 T.C. 238 (1987). In Ag Processing, 153 T.C. at ___ (slip op. at 47-48), this Court held that once computed, DPAD must be allocated between the nonexempt subchapter T cooperative's patronage and nonpatronage accounts on Schedule G.

**[*16]**         2.     <u>Method</u>

The parties disagree about the proper method of allocating petitioner's

DPAD between the patronage and nonpatronage columns on Schedule G.  On its

Schedule G for 2009 and 2010 petitioner allocated the DPAD it generated between

its patronage and nonpatronage accounts on the basis of QPAI.  With respect to

the passed-through DPAD petitioner received from other cooperatives of which it

was a patron, petitioner assigned each passed-through amount directly to the

patronage or nonpatronage column on Schedule G on the basis of petitioner's

business relationship with the cooperative.

Petitioner argues that allocation on the basis of QPAI is a "reasonable

method of allocation" under section 199, referencing the EAG rule and the

regulations under section 199 that use QPAI as a basis for allocating DPAD.  <u>See,</u>

<u>e.g.</u>, sec. 199(d)(4)(C); sec. 1.199-7(c), Income Tax Regs.  Respondent argues that

using QPAI as the basis for allocation is improper and reiterates his position that

DPAD should be computed separately for patronage and nonpatronage activities.

Section 199(d)(4) dictates the initial allocation that petitioner must make by

allocating DPAD to each member of its EAG on the basis of QPAI.  However,

under this Court's holding in <u>Ag Processing</u>, a nonexempt subchapter T

cooperative must allocate its DPAD between patronage and nonpatronage

[*17] accounts because of subchapter T, not section 199.[15]  This Court noted that typically the assignment of a particular item is dependent upon its relationship to the cooperative's business purpose.  Ag Processing, 153 T.C. at ___ (slip op. at 46-47) (citing Ill. Grain Corp. v. Commissioner, 87 T.C. 435, 459 (1986)).  Petitioner generally allocated items of income and expense/deduction between the patronage and nonpatronage columns on Schedule G.  It allocated the DPAD that was passed through from other cooperatives on the basis of its business relationship to that cooperative.  In Ag Processing, 153 T.C. at ___ (slip op. at 47), this Court further stated:  "Where an item of income or expense/deduction is attributable to both patronage and nonpatronage activity, however, it is appropriate to allocate that item between patronage and nonpatronage accounts".  Petitioner generally followed that rule for Schedule G purposes[16] and should allocate its

_____

[15]A nonexempt subch. T cooperative would calculate a single DPAD under sec. 199 and then allocate that amount between its patronage and nonpatronage columns on Schedule G.  In the case of an EAG, each member of the EAG would receive an allocation of DPAD on the basis of its QPAI.  Sec. 199(d)(4)(C).  Then any nonexempt subch. T cooperative member of the EAG would allocate its DPAD between its patronage and nonpatronage accounts on its Schedule G.  The Court knows of no reason that an EAG that also files a consolidated return, such as petitioner, cannot also use this method.

[16]Petitioner allocated Growmark's DPGR and W-2 wages, for example, on the basis of the volume of business done with members.  Respondent does not dispute--and the Court need not address--whether petitioner's Schedule G

(continued...)

**[*18]** aggregate DPAD using the same method it used for its other Schedule G allocations.

II.    Conclusion

The Court concludes that in accordance with this Court's holding in Ag Processing, petitioner is not required to compute separate DPAD amounts for its patronage and nonpatronage activities.  Also in accordance with this Court's holding in Ag Processing, petitioner must allocate its aggregately computed DPAD between its patronage and nonpatronage accounts.  Because the Schedule G allocation is done pursuant to subchapter T, not section 199, petitioner should allocate the aggregate DPAD on its Schedule G using the same method it used for its other Schedule G allocations.  The remainder of this case concerning petitioner's COGS calculation will be the subject of a separate opinion.

---

[16](...continued)
allocations were proper.